# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **JEFFREY C. CALKIN**, | Case No. 6:12-cv-01706-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **CAROLYN W. COLVIN**, Commissioner of Social Security, | |
| Defendant. | |

Richard F. McGinty, McGinty & Belcher, PC, P.O. Box 12806, Salem, OR 97309. Of Attorneys for Plaintiff.

S. Amanda Marshall, United States Attorney, and Adrian L. Brown, Assistant United States Attorney, United States Attorney's Office, District of Oregon, 1000 S.W. Third Avenue, Suite 600, Portland, OR 97201; Franco L. Becia, Assistant Regional Counsel, John C. LaMont, Special Assistant United States Attorney, and Mathew W. Pile, Office of the General Counsel, Social Security Administration, 701 Fifth Avenue, Suite 2900 M/S 221A, Seattle, WA 98104. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Mr. Jeffrey C. Calkin ("Calkin") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Calkin's application for Supplemental Security Income ("SSI"). For the reasons stated below, the decision is reversed and this case is remanded for further proceedings pursuant to 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it is based on the proper legal standards and the findings are supported by substantial evidence. 42 U.S.C. § 405(g); *see*

*also Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). "Substantial evidence" means "more than a mere scintilla but less than a preponderance." *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995)). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Andrews*, 53 F.3d at 1039).

Where the evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading of the record, and this Court may not substitute its judgment for that of the Commissioner. *See Batson v. Comm'r*, 359 F.3d 1190, 1193 (9th Cir. 2004). "[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (quotation marks omitted)). A reviewing court, however, may not affirm the Commissioner on a ground upon which the Commissioner did not rely. *Id.*; *see also Bray*, 554 F.3d at 1226.

## BACKGROUND

### A.  The Application

Calkin filed a Title XVI application for SSI benefits on December 8, 2008, alleging disability beginning on May 29, 1975.[1] AR 162. Calkin's claim is based on his alleged disability

---

[1] Calkin filed his first Title XVI application for SSI benefits on December 5, 2000, alleging disability beginning on April 1, 1990 because of attention deficit hyperactivity disorder ("ADHD"), a personality disorder, antisocial behavior, and borderline intellectual functioning. AR 87. The Administrative Law Judge ("ALJ") reviewed Calkin's application at a hearing and concluded that Calkin was not disabled. AR 93. Calkin filed a second Title XVI application for SSI benefits on November 23, 2005. AR 20. The Commissioner denied Calkin's application and Calkin did not appeal. AR 20, 213.

caused by bipolar disorder, hallucinations, mental health, and neuropathy. AR 216-17. Calkin

was born in 1975 and is 38 years old. *Id.* Calkin has two children, and has supervised visitation

rights to see his son. AR 62, 586-98. Calkin attended school through the eighth grade. AR 222.

Calkin's work history is as a temporary laborer, with his largest reported income coming from

his work as a gas station attendant. AR 207-10, 217-18.

      The Commissioner denied Calkin's application initially and upon reconsideration;

thereafter, Calkin requested a hearing before an ALJ. AR 164-74. Calkin was represented by

counsel and appeared at a hearing held on February 4, 2011. AR 32. The ALJ found Calkin not

to be disabled and thus ineligible for SSI for the period beginning December 8, 2008 through

March 25, 2011, the date of the decision.[2] AR 27. Calkin petitioned the Appeals Council for

review of the ALJ's decision. AR 14. On July 19, 2012, the Appeals Council denied the request

for review, making the ALJ's decision the final decision of the Commissioner. AR 1-3. Calkin

now seeks judicial review of that decision.

**B.  The Sequential Process**

      A claimant is disabled if he or she is unable to "engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which . . . has lasted or

can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C.

§ 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for

---

      [2] Calkin's earlier disability determinations from 2000 and 2005, finding that Calkin was
not disabled, create a presumption of nondisability for his disability claim beginning May 29,
1975. *See Schneider v. Comm'r of Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000). "The
presumption can be overcome, however, when the claimant presents evidence of 'changed
circumstances.'" *Id.* (quoting *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989)). Calkin did
not brief or address the issue of "changed circumstances," and the Court does not address the
issue because Calkin's application for SSI benefits, if granted, would only be payable the month
after his application was filed. *See* 20 C.F.R. § 416.335. Thus, the issue of Calkin's disability
before December 8, 2008 is not relevant.

determining whether an applicant is disabled within the meaning of the Social Security Act."

*Keyser v. Comm'r Soc. Sec. Admin.,* 648 F.3d 721, 724 (9th Cir. 2011); *see also* 20 C.F.R.

§ 404.1520 (DIB); 20 C.F.R. § 416.920 (SSI); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). Each

step is potentially dispositive. 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4). The five-step

sequential process asks the following series of questions:

1.    Is the claimant performing "substantial gainful activity?" 20 C.F.R. §§ 404.1520(a)(4)(i); 416.920(a)(4)(i). This activity is work involving significant mental or physical duties done or intended to be done for pay or profit. 20 C.F.R. §§ 404.1510; 416.910. If the claimant is performing such work, she is not disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520(a)(4)(i); 416.920(a)(4)(i). If the claimant is not performing substantial gainful activity, the analysis proceeds to step two.

2.    Is the claimant's impairment "severe" under the Commissioner's regulations? 20 C.F.R. §§ 404.1520(a)(4)(ii); 416.920(a)(4)(ii). An impairment or combination of impairments is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1521(a); 416.921(a). Unless expected to result in death, this impairment must have lasted or be expected to last for a continuous period of at least 12 months. 20 C.F.R. §§ 404.1509; 416.909. If the claimant does not have a severe impairment, the analysis ends. 20 C.F.R. §§ 404.1520(a)(4)(ii); 416.920(a)(4)(ii). If the claimant has a severe impairment, the analysis proceeds to step three.

3.    Does the claimant's severe impairment "meet or equal" one or more of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, then the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii); 416.920(a)(4)(iii). If the impairment does not meet or equal one or more of the listed impairments, the analysis continues. At that point, the ALJ must evaluate medical and other relevant evidence to assess and determine the claimant's "residual functional capacity" ("RFC"). This is an assessment of work-related activities that the claimant may still perform on a regular and continuing basis, despite any limitations imposed by his or her impairments. 20 C.F.R. §§ 404.1520(e); 404.1545(b)-(c); 416.920(e); 416.945(b)-(c). After the ALJ determines the claimant's RFC, the analysis proceeds to step four.

4.    Can the claimant perform his or her "past relevant work" with this RFC assessment? If so, then the claimant is not disabled. 20 C.F.R.

§§ 404.1520(a)(4)(iv); 416.920(a)(4)(iv). If the claimant cannot perform his or her past relevant work, the analysis proceeds to step five.

5.      Considering the claimant's RFC and age, education, and work experience, is the claimant able to make an adjustment to other work that exists in significant numbers in the national economy? If so, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(v); 416.920(a)(4)(v); 404.1560(c); 416.960(c). If the claimant cannot perform such work, he or she is disabled. *Id.*

*See also Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

The claimant bears the burden of proof at steps one through four. *Id.* at 953; *see also Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999); *Yuckert*, 482 U.S. at 140-41. The Commissioner bears the burden of proof at step five. *Tackett*, 180 F.3d at 1100. At step five, the Commissioner must show that the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Id.*; *see also* 20 C.F.R. §§ 404.1566; 416.966 (describing "work which exists in the national economy"). If the Commissioner fails to meet this burden, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v); 416.920(a)(4)(v). If, however, the Commissioner proves that the claimant is able to perform other work existing in significant numbers in the national economy, the claimant is not disabled. *Bustamante*, 262 F.3d at 953-54; *Tackett*, 180 F.3d at 1099.

**C.  The ALJ's Decision**

The ALJ began his opinion by noting that although SSI is not payable before the month after an SSI application is filed, *see* 20 C.F.R. § 416.335, he would consider Calkin's complete medical history, in accordance with 20 C.F.R. § 416.912(d). AR 21. The ALJ then applied the sequential process. AR 21-27. At step one, the ALJ found that Calkin had not engaged in substantial gainful activity after the date of Calkin's SSI application on December 8, 2008.

AR 22. At step two, the ALJ found that Calkin had schizoaffective disorder, undifferentiated type, which the ALJ characterized as a severe impairment pursuant to 20 C.F.R. § 416.920(c). *Id.* At step three, the ALJ found that Calkin did not have an impairment or combination of impairments that met or medically equaled one of the specific impairments listed in the regulations. AR 22-23.

The ALJ then determined that for the period beginning on the date of Calkin's SSI application of December 8, 2008, Calkin had a RFC:

> [T]o perform the full range of exertional work . . . but has the specific following non-exertional limitations: limited to performance of simple, routine, and repetitive work; less than occasional contact with the general public; occasional contact with supervisors and co-workers in tasks which do not require a cooperative effort.

AR 23. At step four, the ALJ determined that Calkin had no past relevant work, and thus transferability of job skills was not an issue in this case. AR 26. At step five, the ALJ found that given Calkin's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Calkin could perform. AR 26. After considering the vocational expert's testimony, the ALJ found that Calkin could perform work as a folder or a sorter. *Id.* Thus, the ALJ found Calkin not to be disabled, as defined by the Social Security Act. AR 27.

## DISCUSSION

Calkin argues that the ALJ erred by: (1) failing fully to consider all relevant medical opinion evidence; and (2) improperly relying on certain medical treatment records from the Oregon Department of Corrections.

## A.  Medical Opinion Evidence

Calkin argues that the ALJ failed fully to consider all relevant medical opinion evidence, thereby making the ALJ's RFC determination erroneous. Specifically, Calkin argues that the ALJ failed fully to consider the medical opinions of: (1) Dr. Jay Wung; (2) Dr. David N. Sweet; (3) Dr. Paul Stoltzfus; (4) Dr. Shane Haydon; and (5) Dr. Maribeth Kallemeyn. Each alleged error is addressed in turn.

### 1.  Legal Standards

The Commissioner "will always consider the medical opinions" in a case "together with the rest of the relevant evidence" received. 20 C.F.R. § 404.1527(b); *see also Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996) (finding that an ALJ failed to consider substantial and undisputed evidence "during the *relevant period*") (emphasis added); *Melloni v. Massanari*, 98 F. App'x 659, 662 (9th Cir. 2004) (upholding an ALJ's decision that considered medical evidence from the relevant period). In evaluating medical opinions as evidence, generally an examining physician's opinion carries more weight than a non-examining physician. *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) and 20 C.F.R. § 404.1527(d)). Although an ALJ "is not bound by an expert medical opinion on the ultimate question of disability, she must provide 'specific and legitimate' reasons for rejecting the opinion" of an examining physician. *Tommasetti*, 533 F.3d at 1041; *see also Lester*, 81 F.3d at 830 ("And like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record."). This burden is satisfied where an ALJ sets out "a detailed and thorough summary of the facts and conflicting clinical evidence, stating [her] interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted). "An ALJ may reject a treating physician's opinion if it is

based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible." *Tommasetti*, 533 F.3d at 1041.

An ALJ must consider "all of [a claimant's] medically determinable impairments," including "medically determinable impairments that are not 'severe,'" in making an RFC determination. 20 C.F.R. §§ 404.1545(a)(2); 416.945(a)(2). "[A]n RFC that fails to take into account a claimant's limitations is defective." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). An ALJ's findings, however, need only be consistent with relevant assessed limitations and not identical to them. *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1222-23 (9th Cir. 2010).

### 2. Dr. Jay Wung

The ALJ relied on a portion of Dr. Wung's February 9, 2011 letter, the Mental Residual Functional Capacity report that Dr. Wung completed for Calkin, and the treatment records from Dr. Wung and Northwest Human Services from July 2009 through November 2010. The ALJ, however, did not credit the portion of Dr. Wung's letter noting that Calkin generally had an annual six-week exacerbation of his symptoms, reasoning that Dr. Wung's opinion was based on Calkin's self-reported symptoms. The ALJ also concluded that the portions of Dr. Wung's letter noting Calkin's difficulty with concentration and people were sufficiently incorporated in Calkin's RFC. The, however, ALJ gave only "some evidentiary weight" to Dr. Wung's Mental Residual Functional Capacity report. Specifically, the ALJ did not consider the "markedly limited" notations on that report, explaining that they were inconsistent with the ALJ's assessment of Calkin's ability to function. Finally, the ALJ found that the Northwest Human Services treatment records demonstrate that Calkin's prognosis was "fair to good" and that Calkin had been improving during his recent course of treatment.

Calkin argues that the ALJ erroneously discounted: (1) the limitations noted in Dr. Wung's February 9, 2011 letter; and (2) the limitations from Calkin's Mental Residual Functional Capacity report. Calkin argues that his medical treatment records from Northwest Human Services support his challenge to the ALJ's decision. As a result, Calkin contends that Dr. Wung's opinion of Calkin's mental limitations was not properly and sufficiently incorporated into his RFC.

### a.    February 9, 2011 Letter

Beginning with Dr. Wung's February 9, 2011 letter, Calkin argues that the ALJ failed to include Calkin's limitations related to: (1) the annual six-week period when Calkin's medical conditions supposedly are exacerbated; (2) Calkin's interactions with people; and (3) Calkin's ability to concentrate. Calkin's RFC included a non-exertional limitation for "simple, routine, and repetitive work" and limited Calkin's interaction with people to "less than occasional contact with the general public" and "occasional contact with the supervisors and co-workers in tasks which do not require a cooperative effort." AR 23.

Regarding the annual six-week period and Calkin's diagnosis of bipolar I disorder, Dr. Wung wrote:

> There has been one period of 6 weeks in the past year where he has had constant and abnormally irritable mood which is distinctly different from his normal self. During this period, he was unable to effectively communicate with almost anyone since the mood change was so constant and unwavering. I have not seen him long enough to know what the typical frequency of these episodes are [*sic*], but based on his known history, I would expect this would occur for 6 weeks once a year.

*Id.* The ALJ did not give full evidentiary weight to Dr. Wung's explanation of Calkin's bipolar episode, which the ALJ called a "self-reported irritable episode." AR 25. Calkin testified at the hearing that for "[s]ometimes two or three days in a row" he is unable to get out of bed. AR 46.

Calkin also stated that he "can't go in crowds of people." AR 55. Neither the ALJ nor Calkin's attorney asked Calkin if he self-reported the annual six-week period where he had a constant and abnormally irritable mood. Moreover, Dr. Wung's letter and treatment records do not indicate whether Dr. Wung's finding regarding the six-week period is based on Calkin's self-reported symptoms rather than Dr. Wung's personal observations or treatment records.

Dr. Wung's opinion must be based "to a large extent" on Calkin's properly discounted self-reported symptom testimony in order for the ALJ to reject Dr. Wung's opinion. *See Tommasetti*, 533 F.3d at 1041 (citation and quotation marks omitted). Moreover, "an ALJ does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1199-1200 (9th Cir. 2008). Although the ALJ found that Calkin's testimony was not credible, and Calkin does not challenge that determination in this appeal, it is not clear that Dr. Wung's testimony is based, to any significant extent, on Calkin's self-reported symptoms. Instead, as Calkin's treating physician, the symptoms described in the letter may be based on Dr. Wung's personal observations of Calkin and Dr. Wung's treatment records. *See* AR 599-652. Because the ALJ did not determine what portion of Dr. Wung's letter was based on Calkin's self-reported symptoms, the ALJ's treatment of Dr. Wung's medical opinion is not supported by substantial evidence. *See* 20 C.F.R. § 404.1527(d)(2); s*ee also Tommasetti*, 533 F.3d at 1041.

Regarding Calkin's limitation relating to his interaction with people, Dr. Wung noted that Calkin had difficulty interacting with individuals. AR 655. The ALJ's conclusion that Calkin can sustain less than occasional contact with the general public is supported by substantial evidence.

The ALJ's conclusion about Calkin's ability to interact with supervisors and co-workers is not. Dr. Wung explained in his letter that Calkin "has particular difficulty communicating with others, since he has difficulty following and attending to one topic of conversation." AR 655. Dr. Wung also noted that when Calkin is impaired by bipolar I disorder, "he [is] unable to effectively communicate with almost everyone" because his mood changes are "so constant and unwavering." *Id.* The ALJ assumed that this was a "self-reported irritable episode" and did not evaluate whether Dr. Wung's comments about Calkin's mood changes and irritability were instead based on Dr. Wung's extensive treatment history with Calkin. *See* AR 599-652. The ALJ's RFC determination relating to co-workers and supervisors, therefore , is not supported by substantial evidence.

The ALJ also did not incorporate Dr. Wung's medical opinion regarding Calkin's ability to concentrate. "[A]n ALJ's assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with restrictions identified in the medical testimony." *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008). Dr. Wung wrote in his letter that Calkin "persistently has impairments in concentration, attention, and to a lesser extent memory." AR 655. Because of this, Dr. Wung explained, Calkin has "difficulty following and attending to one topic of conversation." *Id.* Dr. Wung concluded that Calkin had a "reduced ability to tolerate frustration and changes in routine." AR 655. The records from Northwest Human Services from July 2009 to November 2010 indicate that Calkin struggled to find housing, had periods of significant mental instability, and at times had difficulty following the mental treatment plan developed for him. AR 599-652. Calkin's 11-year work history also indicates that he was unable to hold down steady employment. AR 207-210.

Unlike the claimant in *Stubbs-Danielson*, the medical evidence by Dr. Wung does not reflect that Calkin retains the ability to do simple, repetitive, routine tasks despite his limitations with concentration, attention, and, to a lesser, extent memory. *See Stubbs-Danielson*, 539 F.3d at 1173 (explaining that the medical evidence demonstrated that the claimant "retained the ability to do simple, repetitive, routine tasks"). The RFC did not address Calkin's persistent limitations related to concentration and memory and, instead, included only a limitation to "simple, routine, and repetitive work." AR 23. The Court finds that the ALJ's RFC determination is not supported by substantial evidence.

Considering the entire context of Dr. Wung's letter, the ALJ's decision discounting Dr. Wung's opinion is not supported by substantial evidence. The ALJ should consider whether the potential six-week impairment or Calkin's limitations regarding his interactions with people and concentration were largely based on Calkin's self-reporting or, instead, on independent clinical analysis.

### b. Mental Residual Functional Capacity Report

Calkin next challenges the ALJ's failure to give full weight to all elements of the Mental Residual Functional Capacity report prepared on February 11, 2011. AR 25. The ALJ gave the Mental Residual Functional Capacity report prepared by Dr. Wung "some evidentiary weight with the exception of the markedly limited notations because [they were] inconsistent with the claimant's ability to function, [and] the observations of the claimant during the course of treatment." *Id.* The ALJ's conclusion is deficient for two reasons. First, the reasons for rejecting Dr. Wung's "markedly limited" notations are not supported by substantial evidence. Second, the ALJ failed to incorporate into Calkin's RFC the "moderately limited" and "extreme" functional limitations in Calkin's Mental Residual Functional Capacity report. Thus, Calkin's RFC is deficient and not supported by substantial evidence. *Cf. Valentine*, 574 F.3d at 690.

PAGE 12 – OPINION AND ORDER

Dr. Wung found Calkin "markedly limited" in his ability to: (1) "understand and remember detailed instructions"; (2) "carry out detailed instructions"; (3) "perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances"; (4) "work in coordination with or proximity to others without being unduly distracted by them"; (5) "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods"; (6) "accept instructions and to respond appropriately to criticism from supervisors"; and (7) "get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes." AR 658-59. Dr. Wung also found that Calkin was "markedly limited" in his ability to maintain "concentration, persistence, or pace." AR 659.

Although the ALJ found that Calkin's ability to function contradicted these limitations, the ALJ did not cite to any specific record evidence. In fact, the medical observations of Calkin during the course of his treatment demonstrate that Calkin had a tenuous ability to function due to his varying mental conditions. *See* AR 630-34 (documenting Calkin's inability to maintain regular housing); AR 634 (noting that even when psychological symptoms were "mild," Calkin suffered from "prominent anxiety symptoms"); AR 643 (reporting that that Child Protective Services was concerned about Calkin's "mental health stability" and that Calkin "no showed twice for visits with the children"); AR 644 (documenting Calkin arriving at a visitation with his children more than three hours late and "angry, demanding, [and] beligerant [*sic*]"); AR 62-64 (reflecting that despite Calkin's hope of providing a permanent and stable environment for his son, Calkin was limited to supervised visitation rights). Later in 2010, Dr. Wung and others observed some improvement in Calkin's mental condition and noted that Calkin's symptoms

were "directly connected to psychosocial stressors." AR 647. These observations, however, did

not indicate whether Calkin was not still suffering from by his diagnosed medical conditions.

Calkin also argues that his Global Assessment of Functioning ("GAF") scores

demonstrate serious limitations. In response, the Commissioner contends that the GAF scores

have little probative value in evaluating disability. The Social Security Administration has

clarified that the GAF scale "does not have a direct correlation to the severity requirements in

our mental disorders listings." *See Cowen v. Comm'r of Soc. Sec.*, 400 Fed. App'x 275, 277 n.1

(9th Cir. 2010) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)). Moreover, the American

Psychiatric Association abandoned the GAF scale in its most recent revision to the *Diagnostic*

*and Statistical Manual of Mental Disorders*. American Psychiatric Association, *Diagnostic and*

*Statistical Manual of Mental Disorders* 16 (5th ed. 2013) (DSM-5). The Court finds that even if

GAF scores have little probative value, it is not clear what other evidence in the record supports

the ALJ's conclusion.

Calkin's treatment records are consistent with the seven areas that Dr. Wung identified as

"markedly limited" in his Mental Residual Functional Capacity report. Moreover, several of the

"markedly limited" areas are in direct conflict with Calkin's RFC.[3] Thus, the Court finds that the

---

[3] Calkin's RFC included a non-exertional limitation for "simple, routine, and repetitive work" and limited Calkin's interaction with people to "less than occasional contact with the general public" and "occasional contact with the supervisors and co-workers in tasks which do not require a cooperative effort." AR 23. In contrast with this RFC, Calkin's Mental Residual Functional Capacity report indicates he is "markedly limited" in his ability to "perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances"; "work in coordination with or proximity to others without being unduly distracted by them"; "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods"; "accept instructions and to respond appropriately to criticism from supervisors"; and "get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes." AR 658-59.

ALJ's rejection of the "markedly limited" functions in Calkin's Mental Residual Functional

Capacity report is not supported by substantial evidence. *See Valentine*, 574 F.3d at 690.

The ALJ gave "some weight" to the remaining portions of Calkin's Mental Residual

Functional Capacity report. Accordingly, Calkin was "moderately limited" in his ability to: (1)

"remember locations and work-like procedures"; (2) "sustain an ordinary routine without special

supervision"; and (3) "carry out very short and simple instructions." AR 658-59. A "moderately

limited" designation indicates that Calkin "may be able to perform this work-related mental

function on a limited basis in a satisfactory manner, but . . . should not be placed in a job setting

where this mental function is critical to job performance or to job purposes." AR 658. Calkin's

RFC, however, provides that Calkin can perform "simple, routine, and repetitive work" and can

have "occasional contact with supervisors." AR 23. Calkin's limitations related to carrying out

"short and simple instructions" and remembering "work-like procedures" are not incorporated

into his RFC. As noted above, Calkin's treatment history with Northwest Human Services

documents these limitations. Further, Calkin's RFC provides for "occasional contact with

supervisors," but does not address Calkin's need for special supervision.

The ALJ also failed to account for Calkin's one "extreme" limitation. Dr. Wung found

that Calkin had an extreme limitation in his "ability to maintain attention and concentration for

extended periods," which included the approximate two-hour segments between arrival and first

break, lunch, second break, and departure. AR 658. An "extreme" limitation is one that

"represents a degree of limitation that is incompatible with the ability to do any gainful activity."

*Id.* The ALJ noted that this "check-off mental capacity form" would be given "some evidentiary

weight," but failed to address this significant limitation. There is no basis to conclude that

Dr. Wung's completion of the Mental Residual Functional Capacity report was based largely on

Calkin's self-reported symptoms. *Cf. Ryan*, 528 F.3d at 1199-1200. Furthermore, the check-off

Mental Residual Functional Capacity report is not conclusory or inadequately supported because

Dr. Wung provided a letter explaining Calkin's abilities. AR 655, 658; *see Holohan*, 246 F.3d

at 1207 (permitting an ALJ to discredit medical opinions that "merely check[] boxes without

giving supporting explanations"). The Court finds that this portion of the ALJ's opinion is not

supported by substantial evidence.

### 3.  Dr. David N. Sweet

The ALJ found that Calkin's testimony was not credible, based in part on psychologist

Dr. Sweet's treatment notes from October 10, 2010. Dr. Sweet conducted a psychological

reevaluation of Calkin on October 4, 2010 at the request of the Oregon Department of Human

Services for the purposes of addressing Calkin's "general psychological condition . . .

particularly as it pertains to his ability to function as a parent." AR 586-98. To support his

conclusion that Calkin's testimony was not credible, the ALJ relied on (1) Dr. Sweet's

reevaluation as evidence that Calkin altered his appearance to cater to his specific goals, and

(2) Calkin's admission that he "was not open and honest" with Dr. Sweet in previous

evaluations. AR 24-25. The ALJ did not discuss Dr. Sweet's treatment notes with regard to

Calkin's mental condition. Calkin does not challenge the ALJ's credibility determination but,

instead, argues that Dr. Sweet's report and objective testing were valid. Because of this, Calkin

argues, the ALJ should have considered Dr. Sweet's medical diagnoses when formulating

Calkin's RFC.

The Court finds that the ALJ's limited consideration of Dr. Sweet's medical opinion is

not supported by substantial evidence. During the October 4, 2010 session with Calkin,

Dr. Sweet administered the Wechsler Abbreviated Scale of Intelligence, the Repeatable Battery

for the Assessment of Neuropsychological Status, and Projective Drawings. AR 588. In addition,

PAGE 16 – OPINION AND ORDER

Dr. Sweet had Calkin complete the Minnesota Multi-Phasic Personality Inventory-2 ("MMPI-2"). *Id.* Dr. Sweet noted that Calkin responded to the MMPI-2 in a "disorganized fashion." AR 595. Later, while Dr. Sweet was administering the MMPI-2, Calkin assured Dr. Sweet that Calkin was "paying attention and was putting the responses in the appropriate places." *Id.* Dr. Sweet concluded that Calkin's MMPI-2 validity scales "provide[d] an unusual profile." *Id.* Dr. Sweet's interpretation of the MMPI-2 validity scales was that Calkin:

> [R]esponded in a defensive manner, but he also appears to be willing to admit to a great deal of discomfort, distress, and agitation. This suggests that he may be underreporting some problems while still being willing to admit to problems. There are multiple scale elevations that are difficult to interpret. Suffice it to say that this appears to be somebody who is reporting a high degree of distress and agitation. Clients like this often have difficulty following through on tasks and they may fear losing control. He is reporting problems with attention, concentration, thinking and memory.

*Id.*

The ALJ failed to address Dr. Sweet's validity scale analysis, which did not find that Calkin was faking, exaggerating, or over reporting his symptoms. *Cf. Parent v. Colvin*, 2013 WL 3777088, at *4 (E.D. Wash. July 17, 2013) (finding no error in the ALJ's rejection of a doctor's opinion where the validity scales indicated "the likelihood of faking bad, exaggerated symptoms"). Dr. Sweet did not simply decide to give Calkin the "benefit of the doubt." *See* AR 25. Instead, Dr. Sweet affirmed that Calkin was putting his responses for the MMPI-2 in the appropriate place. Moreover, Calkin's unusual manner of responding to the MMPI-2 was consistent with the symptoms that Dr. Sweet observed. AR 595 ("Clients like this often have difficulty following through on tasks and they may fear losing control."). Dr. Sweet's report was not largely based on Calkin's reported symptoms with "little independent analysis or diagnosis." *Cf. Tommasetti*, 533 F.3d at 1041. The record indicates that Dr. Sweet based his report on an

interactive clinical observation of Calkin. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).

Thus, the ALJ's opinion, giving only "some evidentiary weight" to Dr. Sweet's medical opinion, is not supported by substantial evidence. The Court finds that the ALJ should further develop the record and determine which portions of Dr. Sweet's medical opinion, if any, are largely based on Calkin's self-reported symptoms and, thus, properly discountable.

**4.  Dr. Paul Stoltzfus**

The ALJ took into consideration psychologist Dr. Stoltzfus's February 17, 2009 evaluation of Calkin. The ALJ concluded, however, that it was not clear whether Dr. Stoltzfus's Axis I diagnosis of Calkin under the *Diagnostic and Statistical Manual of Mental Disorders Fourth Edition* ("DSM-IV") was bipolar I disorder or schizoaffective disorder. AR 25. The ALJ also found that Dr. Stoltzfus's opinion "had to be placed into the historical context of the claimant's intentional symptom exaggeration and current over reporting of symptoms." *Id.* Calkin argues that: (1) Dr. Stoltzfus made a valid DSM-IV Axis I diagnosis; and (2) the ALJ should have fully credited Dr. Stoltzfus's medical evaluation.

Dr. Stoltzfus's February 17, 2009 evaluation included a clinical interview of Calkin, a mental status examination of Calkin, and the results of the Millon Clinical Multiaxial Inventory II ("MCMI II"). AR 445. Dr. Stoltzfus also reviewed records from the Oregon Department of Corrections, a psychiatric progress note from September 24, 2008, the intellectual assessment of Dr. Kallemeya from April 10, 1996, and the psychological evaluation of Dr. Roddoch from March of 2005. *Id.*

Beginning with the DSM-IV Axis I diagnosis, Dr. Stoltzfus diagnosed Calkin with "Bipolar I Disorder, Psychotic Disorder NOS, and Polysubstance Dependence, four or five year remission (per self report), Rule out Schizoaffective Disorder." AR 452. In Dr. Stoltzfus's

PAGE 18 – OPINION AND ORDER

Case 6:12-cv-01706-SI   Document 26   Filed 04/03/14   Page 19 of 26

conclusions, he stated: "It is not clear whether or not he [Calkin] meets the criteria for

Schizoaffective Disorder, or whether or not he is Bipolar with psychotic characteristics. Given

the information reviewed, the latter two diagnoses appear to be the most probable." AR 453.

Dr. Stoltzfus's report listed Calkin's DSM-IV Axis I diagnoses in accordance with the

relevant diagnostic standards. *See* American Psychiatric Association, *Diagnostic and Statistical

Manual of Mental Disorders Text Revision* 27 (4th Ed. 2000) (DSM-IV-TR) ("If more than one

Axis I disorder is present, the principal diagnosis or reason for the visit (see p.3) should be

indicated by listing it first."). The DSM-IV-TR explains that multiple disorders may be listed in

an Axis I diagnosis and that "[w]hen an individual has more than one Axis I disorder, all should

be reported." *Id.* Had Dr. Stoltzfus lacked sufficient information to make a diagnosis, such a

conclusion would have been indicated by using the DSM-IV-TR code 799.9 "Diagnosis or

Condition Deferred on Axis I." *See* DSM-IV-TR at 865. The ALJ rejected Dr. Stoltzfus's Axis I

diagnosis because Dr. Stoltzfus did not conclusively rule out schizoaffective disorder.

Dr. Stoltzfus, however, made a complete diagnosis. *Cf. Hilliard v. Barnhart*, 442 F. Supp. 2d

813, 818-19 (N.D. Cal. 2006) (finding that by using the diagnostic code 799.9, a doctor's

diagnosis was incomplete under the DSM-IV standards). The ALJ's conclusion to the contrary is

not supported by substantial evidence.

Dr. Stoltzfus's comments regarding Calkin's past drug use do not invalidate the DSM-IV

Axis I diagnosis. Dr. Stoltzfus's third diagnosis was "Polysubstance Dependence, four or five

year remission (per self report)." AR 452. Dr. Stoltzfus explained that there was "concern

regarding possible ongoing drug use, but there does not seem to be any evidence to contradict the

client's claim that he has been clean for four to five years." AR 452. Dr. Stoltzfus also noted that

"one can only hope that despite his [Calkin's] street appearance and associations, he is not

PAGE 19 – OPINION AND ORDER

abusing substances." AR 453. The conclusion that Calkin was not abusing drugs is corroborated

by his records from Northwest Human Services, which documented that Calkin had not tested

positive for drug use during this same time period. *See* AR 599-652. Therefore, Dr. Stoltzfus's

comment regarding Calkin's past drug use, concluding that Calkin was not using drugs, is not a

sufficient reason for the ALJ to disregard Dr. Stoltzfus's DSM-IV Axis I diagnosis.

The ALJ also discounted Dr. Stoltzfus's DSM-IV Axis I diagnosis because Dr. Stoltzfus

observed Calking as having "an incredible range of cognitive and personality dysfunctions" and

"obvious distress with the evaluator during moments of the examination, followed by periods of

relative trust." AR 25 (citing AR 453). Dr. Stoltzfus also noted in his report that Calkin's "over

reporting of all kinds of psychiatric problems makes sorting out his true psychiatric condition

extremely difficult." AR 452. Dr. Stoltzfus concluded that "[r]egardless of the exact symptoms,

he [Calkin] certainly gives the appearance of being extremely unstable." AR 453. The ALJ found

that Dr. Stoltzfus's medical opinion and impressions "had to be placed into the historical context

of the claimant's intentional symptom exaggeration and current over reporting of symptoms."

AR 25. Dr. Stoltzfus, however, did not find that he was unable to make a complete diagnosis

based on Calkin's symptom presentation.

Dr. Stoltzfus's "Personality/Emotional Functioning" summary provided that "[i]t does

seem evident that the highest elevations were consistent with presentation during the interview,

and include high degrees of anxiety and depression, extreme paranoid delusions, along with

antisocial pessimistic schizoid and schizotypal features and characteristics." AR 452. The record

indicates that a potential for over reporting did not negatively affect Dr. Stoltzfus's ability to

render a diagnosis. Dr. Stoltzfus, in fact, rejected this as a reason to not issue a diagnosis. In his

impression notes, Dr. Stoltzfus stated:

> Psychological evaluation four years ago concluded that the client was exaggerating and making up symptoms, substantiated by contradictory statements and reporting symptoms which were not considered part of a typical symptom set to support several different diagnosis. *More recent evaluations and mental health assessments noted the patient has mood swings associated with Bipolar Disorder, is paranoid, and has been on a variety of antidepressant and antipsychotic medications*. While there are problems in his overall symptom explanation, *the client's disturbed mannerisms and reported symptoms were rather consistent with symptoms reported over the last four or five years*.

AR 452 (emphasis added). The ALJ's rejection of Dr. Stoltzfus's medical opinion simply because of Calkin's past over reporting is not supported by substantial evidence because Dr. Stoltzfus explained why Calkin's more recent behavior and observed symptoms support the diagnoses Dr. Stoltzfus rendered. Moreover, the ALJ failed to explain how Dr. Stoltzfus's conclusions were "unsupported by clinical findings" or "specifically contradicted by the opinions of other examining physicians." *See Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir. 1989).

Because Dr. Stoltzfus's medical opinion does not significantly rely on the self-reported testimony of Calkin and explains that Calkin's behavior and mannerisms were consistent with Dr. Stoltzfus's more recent diagnosis, AR 452, the ALJ should only reject Dr. Stoltzfus's opinion if it is directly contradicted by the opinion of another examining physician. *See Rodriguez*, 876 F.2d at 763. It is not. Thus, the ALJ's decision concerning Dr. Stoltzfus's opinion was not supported by substantial evidence.

### 5. Dr. Shane Haydon

The ALJ cited to Dr. Haydon's psychological evaluation of Calkin in March of 2002 as evidence that Calkin's testimony at the hearing should not be fully credited. AR 328-34. The ALJ noted that Calkin "exaggerated his symptoms and limitations based on, in addition to other factors, [Calkin's] invalid MMPI [Minnesota Multi-Phasic Personality Inventory] at the time." AR 25. Calkin argues that the ALJ improperly relied on Dr. Haydon's psychological evaluation

and failed to incorporate Dr. Haydon's diagnoses in Calkin's RFC. Calkin argues that Dr. Haydon's "Rating of Impairment Severity Report" demonstrates that that Calkin is presumably disabled.

Calkin's arguments are without merit. Dr. Haydon's March 2002 psychological evaluation of Calkin is not significant probative evidence to the ALJ's determination of Calkin's SSI application for the period beginning December 8, 2008. AR 328; *see also Osmore v. Astrue*, 472 F. App'x 529, 532 (9th Cir. 2012) (explaining that "out-of-date" evidence from before the date of the pending disability application is not probative evidence of that later alleged disability status). The time period in which Dr. Haydon evaluated Calkin was relevant to Calkin's first Title XVI application for SSI benefits. AR 87-94. Social security claimants are generally barred by res judicata and may not seek reconsideration of previous disability determinations. *See Lester v. Chater*, 81 F.3d 821, 825 (9th Cir. 1995).

Calkin provides no reason to reevaluate the disability claim that was rejected following his first application for SSI benefits. The ALJ also did not de facto reopen the prior adjudications by the Social Security Administration regarding Calkin or accept Calkin's alleged onset date of May 29, 1975. AR 21; s*ee Lewis v. Apfel*, 236 F.3d 503, 510 (9th Cir. 2001) (permitting the consideration of evidence that may otherwise be barred by res judicata when the ALJ "later considers 'on the merits' whether the claimant was disabled during an already-adjudicated period"). There is no reason to assume Dr. Haydon's March 2002 medical opinion is "significant probative evidence" of Calkin's disability claim beginning on December 8, 2008. *Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1894) (citing *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981). The ALJ, however, properly considered Dr. Haydon's opinion for the purposes of evaluating Calkin's credibility. *See Smolen*, 80 F.3d at 1284 (explaining that the ALJ's

credibility determination may include the claimant's "reputation for lying"). Thus, the ALJ's analysis of Dr. Haydon's medical opinion is supported by substantial evidence.

### 6. Dr. Maribeth Kallemeyn

The ALJ's opinion did not mention or reference Dr. Kallemeyn. Calkin argues that the ALJ was required to consider all of the record evidence and thus should have considered the medical opinion of Dr. Kallemeyn. The Commissioner contends that Dr. Kallemeyn's assessment of Calkin in 2006 was more than two years before the time period relevant in this case and thus the ALJ was not required to discuss Dr. Kallemeyn's conclusions.

The ALJ need not discuss "*all* evidence presented" but, instead, must "explain why 'significant probative evidence has been rejected.'" *Vincent*, 739 F.2d at 1394-95; *see also Howard v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003) (noting that an ALJ need not discuss every piece of evidence). Dr. Kallemeyn's medical opinion is not "significant probative evidence" because it pre-dates the relevant period of claimed disability in this case, which begins on December 8, 2008. Thus, the ALJ was not required to consider Dr. Kallemeyn's medical opinion.

## B. Oregon Department of Corrections Treatment Records

The ALJ reasoned that Calkin's RFC was better reflected in his "medical treatment records from the Oregon Department of Corrections ["ODC"] from 2004 to 2008." AR 25. The ALJ provided no additional analysis regarding the ODC records. Calkin argues that the ODC medical treatment records do not provide a valid basis for determining Calkin's RFC and that the ALJ's conclusion to the contrary was in error. Calkin argues that because the ALJ never cited to specific ODC records, Calkin was unable to rebut or analyze the sufficiency of those records. The Commissioner provided no response to Calkin's challenge on this point.

The Court agrees that Calkin's RFC is not properly reflected in the ODC medical treatment records. The first set of ODC records, from June 17, 2004 through October 9, 2008, document dosages and medications given to Calkin, but provide no other significant diagnostic details. AR 370-444. The additional ODC treatment records from June 17, 2004 through November 19, 2008 also do not discuss Calkin's mental condition in any meaningful detail. AR 499-585. Further, many of the notations are illegible. *See* AR 499-585; *see also* AR 448 (Dr. Stoltzfus's opinion that the ODC records and physician's handwriting were illegible).

More problematic is the fact that the ODC treatment record timeframe is before the relevant disability period, which begins on December 8, 2008. The Court notes that the ODC medical treatment records may have some other probative value in evaluating Calkin's RFC, but the ALJ provided no statement or explanation. The Court cannot uphold the ALJ's decisions on grounds not cited by the ALJ. *See Orn*, 495 F.3d at 630 ("We review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely."). Therefore, the Court finds that the ALJ's reliance on the ODC medical treatment records is not supported by substantial evidence.

## C. Remand for Further Consideration

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000), *cert. denied*, 531 U.S. 1038 (2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Strauss v. Comm'r*, 635 F.3d 1135, 1138-39 (9th Cir. 2011) (quoting *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004)).

The court may not award benefits punitively and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the Act. *Id.* at 1138.

Under the "credit-as-true" doctrine, evidence should be credited and an immediate award of benefits directed where: (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *Id.* The "credit-as-true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003) (citing *Bunnell v. Sullivan*, 947 F.2d 341, 348 (9th Cir. 1991) (en banc)). The reviewing court should decline to credit testimony when "outstanding issues" remain. *Luna v. Astrue*, 623 F.3d 1032, 1035 (9th Cir. 2010).

In this case, further administrative proceedings are warranted, and the Court declines to credit the improperly rejected medical testimony. *See Luna*, 623 F.3d at 1035. The ALJ's treatment of the medical opinions of Dr. Wung, Dr. Sweet, and Dr. Stoltzfus was erroneous for the reasons stated above. The ALJ should also explain the basis, if any, for relying on the ODC records. The ALJ's subsequent RFC assessment and hypothetical questions to the vocational expert at step four and determination at step five that jobs exist in the national economy are therefore not based upon the proper legal standards. This case is remanded for further proceedings. If necessary, the ALJ must revise Calkin's RFC determination. Finally, the ALJ must make adequate step four and five determinations incorporating any revised findings.

## CONCLUSION

The Court REVERSES the Commissioner's final decision and REMANDS this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this

Opinion and Order. The testimony and records to be considered at these proceedings consist of:

(1) Dr. Jay Wung's medical opinion, letter, and Mental Residual Functional Capacity report;

(2) Dr. David N. Sweet's medical opinion; (3) Dr. Paul Stoltzfus's psychodiagnostic

examination; and (4) the ODC records from June 17, 2004 through November 19, 2008.

**IT IS SO ORDERED**.

DATED this 3rd day of April, 2014.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge